# EXHIBIT "A"

**Pages 126-170 of the
Transcript of Deposition of Kyu Sang Cho
taken on September 5, 2005**

1   testimony.

2       A.    **(Through Translator)** 8.6 is the final document and

3   the document that we were looking at, that is a process of

4   reaching the final document.  And the most important thing

5   about the final document is that it is saying I will work

6   here, or under these conditions after we have negotiated

7   these issues.  So this is all process and there may be

8   opinions that are different from the chairman's opinion.  For

9   instance, if someone from the head of the division may have a

10  different opinion and they may say I think the salary is

11  still high, and in that case, we may be able to revise the

12  document later.  But this is pretty much showing these are my

13  thoughts.

14  BY MR. THOMPSON:  (CONTINUING)

15      Q.    Okay.  Specifically what thoughts are you expressing

16  through your signature at the top of Page 8.3?

17      A.    **(Through Translator)** The signature is saying that in

18  the chairman's opinion that this looks about right, but in

19  terms of the final decision, there may be some changes if

20  other people, if my advisors have different opinions, they

21  will look into it, and if they have different opinions, then

22  there would be a revision made before the final document.

23  But if there is no problem with my opinion, then it would be

24  carried out as I have suggested.

25      Q.    When you say "this looks about right."  What do you

1   mean "this"; what are you talking about?

2       A.    **(Through Translator)** This specific issue because the

3   executives and advisors would have to look through all of the

4   other issues as well as the issues that I have indicated here

5   and if there are any over lasting or any revisions that has

6   to be made, what I am saying is that the executives or

7   advisors would look for any problems and if they identify any

8   there could be revisions.

9           **MS. LEE:**  Objection.  (Speaking in Korean.)

10          **MR. THOMPSON:**  If you have an objection, I think

11  you should make it in English so the record can reflect what

12  you're saying.

13          **MS. LEE:**  I just asked her about this one could

14  be okay.  She didn't --

15          **MR. THOMPSON:**  Do you agree with that?

16          **TRANSLATOR:**  I may have lost part of the

17  previous statement but there was a statement that he said

18  which verbatim, don't you think this looks about okay.

19          **MS. LEE:**  She missed that sentence.

20          **TRANSLATOR:**  It was in the previous, so I don't

21  know.

22          **MS. LEE:**  So I explained her, how can you say

23  this looks about okay.

24          **MR. THOMPSON:**  Right.  That was the question. I

25  don't think you were listening to the question.  That was in

*Civil Action No. 04-00001*                                         128

1    the question?  So it makes sense in her answer.  Anyway your

2    objection is noted and we have a record.

3                **MS. LEE:**  No, he said that word again, that

4    sentence again, but she didn't translate that same sentence.

5    So, I just ask her how do you translate that.

6                **MR. THOMPSON:**  Okay.

7                **THE WITNESS:**  (Speaking in Korean.)

8                **MR. THOMPSON:**  I'm sorry, what did he say?

9                **TRANSLATOR:**  He asked if his Korean was being

10   recorded as wrong because he doesn't want his testimony to be

11   altered by the interpretation.

12                **MR. THOMPSON:**  Yes, we have a record of

13   everything said and it should be an accurate record.

14   **BY MR. THOMPSON: (CONTINUING)**

15       Q.    So, Chairman Cho, you have just said that your

16   signature represents that this looks about right, but I don't

17   know what you mean by "this"; what do you mean by "this"?

18   Are you talking about the terms and conditions of Mr. Chung's

19   employment?

20                **MR. GREGORY:**  Objection; compound.  Objection;

21   vague.

22       A.    **(Through Translator)**  So, from the chairman's

23   perspective, the signature here signifies that I took an

24   interest in this issue.  On the issues that I take an

25   interest in I would check, so regarding the other issues, I

Kyu Sang Cho:  September 5, 2005

1    would not read over them individually and they would be

2    looked over by the related people in charge, and then they

3    would take a look at it and then they would provide

4    recommendations, and so this document is asking the president

5    or the chairman before they implement any of these issues for

6    the president or the chairman's opinion.  So this is an

7    internal document and the executives or working-level

8    advisors would look into this and they want to know what I

9    think, so this is telling them what I think and perhaps they

10   would give me recommendations that the salary is too high or

11   too low, in which case I may revise my opinion.

12   BY MR. THOMPSON: (CONTINUING)

13       Q.   And what were your opinions after reviewing these

14   two pages with respect to the issues contained in these two

15   pages?

16           MR. GREGORY:  Objection; asked and answered.

17       A.   (Through Translator) In a company when you make a

18   final judgment you are making a decision.  But the form in

19   which these decisions are made are different according to

20   company and this document is a reference into making that

21   decision, which is why it is in a very simple format.  So

22   this is brought to me in a simple format and when I have

23   signed -- what I am saying is that as a reference, my thought

24   regarding this is doesn't this look about okay.  Now, look

25   into this with the people in charge in order to make a

Kyu Sang Cho:  September 5, 2005

1    decision, and that's what I'm saying by signing it.  So, this
2    is a reference document and based on the opinions of the
3    chairman that I have expressed through this document, then
4    the working-level employees may also make some
5    recommendations or opinions accordingly.

6           I would like to add that the format is different
7    according to company and this is a format that is used in
8    order to make the decisions, so I don't think that anybody is
9    in a position to say that this format is right or wrong.  It
10   is the most -- I believe that it is the most efficient and
11   time-effective way into making a decision, which is why we
12   use this format and I -- the only reason, the only reason for
13   this format is to aid the president or the chairman into
14   making the right decision, and I know better than anybody
15   else what this document means, what this format means, and
16   regardless of what other people may say, doesn't this mean
17   this, or doesn't this mean that, I believe that I know the
18   best what this document means and what this format means.
19   BY MR. THOMPSON:  (CONTINUING)
20      Q.   Okay.  And what does it mean?
21              MR. GREGORY:  Objection; asked and answered.
22              TRANSLATOR:  And he asked if we could have a
23   break after the question.
24              MR. THOMPSON:  Yes, of course, we can take a
25   break.  I want you to know in advance that there are

1   questions pending about this document and if you discuss

2   issues about this document either with your lawyer or your

3   Dr. Lee or anyone else, I'm going to ask you about those

4   discussions when you come back.

5              MR. GREGORY:  Attorney/client objection's been

6   noted.  On the record, I object, attorney/client and I just

7   need that there is a question pending.

8              MR. THOMPSON:  Okay.  Thank you.

9                        (Off the record.)

10                       (Back on the record.)

11  BY MR. THOMPSON: (CONTINUING)

12     Q.   Are you looking at Document 8.3 and 8.4?  Excuse me,

13  I want to circle some areas.  I'm circling this Korean word

14  in parenthesis at the top-left-hand corner of Document 8.4.

15  What does that word say?

16     A.   (Through Translator) Appendix.

17     Q.   Reading that word, does that refresh your memory

18  that you reviewed these two documents simultaneously?  These

19  two pages, 8.3 and 8.4, did you review them together?

20     A.   (Through Translator) I don't know what you mean by

21  "simultaneously," I don't know the dates in which I looked

22  over this document.  You have my signature, so I did

23  definitely look over them, but I don't know if I looked over

24  them simultaneously.  If you look at the signatures you can

25  see that I did look over them.

Kyu Sang Cho:  September 5, 2005

1    Q.   Okay.  And you don't know what date you signed this

2  document?

3    A.   **(Through Translator)** That's right.

4    Q.   Did you make any marks on either of these two pages

5  showing your disapproval of any term contained in these

6  pages?

7    A.   **(Through Translator)** Again, I'd like to say that

8  this is a reference material to make a decision, so it is not

9  a confirmation, it is just conveying my opinions.  After this

10  we have to give the advisors an opportunity to check whether

11  the chairman's opinion is right or wrong.  So this is just a

12  reference, this is just a reference in order to convey the

13  chairman's intentions and if the chairman's intentions are

14  wrong, then the advisors can't just sit back and do nothing

15  they have to correct that opinion and I am the most --  I am

16  more familiar with this form than anybody else, so I hope

17  that you will understand that this is not to convey an order,

18  but just to express my thoughts.  And then the advisors or

19  experts would have to verify those thoughts.

20    Q.   What thoughts did you express through your review

21  and signature on these two pages?

22    A.   **(Through Translator)** Regarding the date, for

23  instance -- regarding the date, for instance, this would mean

24  that this date doesn't it look about right, this is my

25  opinion, now take a look at it to see if this date would be

1    okay. And so the date may be revised or modified later on,

2    and also especially on Page 8.4, the part where I wrote about

3    the incentives, this is my opinion saying that rather than

4    giving this person a flat 9,000 then we should give him 8,000

5    and provide him incentives in proportion to the profits,

6    because this would act as a motivation. So, this is my

7    opinion and I am saying this is my opinion, now look into it.

8        Q.    When you wrote down in your handwriting 80,000 plus

9    incentives, was that to convey your intention to compensate

10   Mr. Chung at $80,000 a year plus incentive for his work as

11   vice president of World Corporation?

12           MR. GREGORY:  Objection; vague as to

13   "intention."  I have an additional objection; also asked and

14   answered.  He's been asked at many points and answered at

15   many points already.

16       A.    (Through Translator) No, that is not what I am

17   saying.  What I am saying is that we're going to pay this

18   person a 90,000 fixed rate, then rather than that we should

19   pay him 80,000 plus a percentage of the profits and so it

20   does not mean that let's give this person this much.  It's

21   saying that, for instance, if you are agreeing about the

22   90,000 then perhaps we shouldn't do it this way, we should do

23   it in this other method.

24   BY MR. THOMPSON: (CONTINUING) .

25       Q.    I'm trying to understand, first, what you meant to

1    signify when you signed Exhibit 8.3 at the top, that's what I

2    would like to know; what did you intend to signify by signing

3    on Document 8.3 at the top?

4              MR. GREGORY:  Objection; vague as to where at

5    the top.

6              MR. THOMPSON:  I'll point, excuse me, right

7    there.

8              MR. GREGORY:  I have another objection.  It's

9    been asked and answered many times in this deposition.

10   A.   (Through Translator) Regarding the date, it says

11   April 1st, and I do not have any information about this, I'm

12   not sure about the date, so what it is saying is that

13   whenever you choose, whatever the date is, then I would

14   agree.  So this is telling the date that he will join the

15   company and regarding such date matters, what I am saying is

16   that you discuss among your working-level employees as well

17   as your executives and come up with a date, and whatever

18   then -- I don't think that that is something -- the date is

19   something that the chairman should get involved in, so what

20   it is saying is actually talking about the order, the order

21   itself of Mr. Chung coming into the company.

22   BY MR. THOMPSON: (CONTINUING)

23   Q.   Okay.  Thank you.  So your signature that we were

24   just talking about only relates to that aspect of what your

25   answer was and nothing else; is that correct?

1           MR. GREGORY:  Objection; vague, confusing.

2       A.    (Through Translator) Not necessarily.  I did look

3    over all of the other information and especially the date,

4    and so the signature is comprehensive in that it is saying

5    that well as the chairman I do look over the important issues

6    and I check these issues and it is out of habit that I put my

7    signature to signify that I have looked over this.  So, you

8    cannot put too much additional meaning into the signature.

9    It is just saying that I've read this.

10   BY MR. THOMPSON: (CONTINUING)

11      Q.    Earlier you testified that your signature meant --

12   this signature at the top of Page 8.3 meant that quote, this

13   looks about right.  Is that an accurate statement?

14          MR. GREGORY:  Objection; mischaracterizes prior

15   testimony.

16      A.    (Through Translator) You can't just pick that one

17   aspect out of this because the signature has comprehensive

18   and many meaning.  Like I said, as a matter of habit I --

19   this signature does also mean that, yes, I have read over

20   this and this is one of the meanings that is has, and

21   regarding the date, what it is saying is that this date is

22   okay and I will leave it to the discretion of the

23   working-level employee.  Because I don't know if August -- I

24   don't know if April 1st is the better date or if August 1st

25   is the better date, so I am leaving that to the discretion of

1  the employee.  And as I said, in order for me to make a

2  decision, in order for the chairman to make a decision, I am

3  just conveying my thoughts and what it is saying here is

4  that, well, the order of coming into the company, good, and

5  the date, okay.  If you do it on that date, it's good, if you

6  do it on a different date, then that's good too.  And so the

7  working-level employee would look into this matter based on

8  the principles and would use this information to reach an

9  efficient conclusion.

10 BY MR. THOMPSON: (CONTINUING)

11     Q.    Thank you.  Does your signature at the top of Page

12 8.3 that we've been talking about, that signature, does that

13 signify your agreement that Mr. Chung would be entitled to a

14 three-year contract plus an agreement every year for an

15 extension or a new contract as stated at Item No. 1 on Page

16 8.4?

17     A.    (Through Translator) This does not mean that I agree

18 as the chairman.  This is something that the working-level

19 employees have to look over.  We have somewhat of a training

20 period because if you become a regular employee of the

21 company, then it comes difficult to fire that person, right?

22 So when we hire a regular employee we would have to have the

23 okay of the employee, as well as the employer, and so we have

24 a training period before we employ them out as a regular

25 worker.  And regarding the three-year contract plus the

Kyu Sang Cho:  September 5, 2005

Civil Action No. 04-00001                                    137

```
1   renewal every year, that is not something that the chairman

2   would decide, that would be something that the working-level

3   employees would determine according to the regulations of the

4   company.  The chairman has a lot to do and if the chairman

5   has to spend so much time on just one person, then the

6   chairman would never get anything done and then the company

7   would just go bankrupt, so I do not look into the specific

8   matters.

9              MS. LEE:  Objection.  You said -- (Inaudible.)

10             TRANSLATOR:  Yes, I agree.

11             MR. THOMPSON:  Okay.

12  BY MR. THOMPSON:  (CONTINUING)

13     Q.   Does your signature on the top of Page 8.3 signify

14  your approval of an annual salary of $80,000 plus a

15  percentage of net income as expressed in Item 2 on Exhibit

16  8.4?

17             MR. GREGORY:  Objection; asked and answered.

18     A.   (Through Translator) I have explained this many

19  times.  Do you want me to explain this again?  We have a

20  department advisor and executive and whether $10,000 is okay

21  for this person or not, that would depend on the opinion of

22  the employee, as well as the fairness with other employees as

23  well.  And, this is all information that I don't have, so the

24  executive-in-charge would be the one that's left with a

25  decision regarding that.  The chairman would not make
```

Kyu Sang Cho:  September 5, 2005

1    decisions regarding that.

2    BY MR. THOMPSON: (CONTINUING)

3        Q.    Who was the executive-in-charge relating to

4    Mr. Chung's employment?

5                MR. GREGORY:  Objection; relevance.

6        A.    (Through Translator) One would be, I believe,

7    Director Bay, and I am getting confused, but also the head of

8    the support headquarters - I do not remember his name at the

9    moment - but these two executives would have been involved.

10   BY MR. THOMPSON: (CONTINUING)

11       Q.    How about your son, President Taeho Cho?

12       A.    (Through Translator)  Regarding such salary issues,

13   the president would be in charge of policy and such details

14   would not -- the president would not deal with the details of

15   such issues.  And so, the president would receive reports of

16   big chunks relating this issue, but especially considering

17   the president's experience in our issues, the president would

18   not get strongly involved in this process.  Of course,

19   because he has a responsibility, but the real authority

20   regarding this issue would go to the executive that has a

21   good knowledge of the regulation and this executive's opinion

22   would be strongly reflected.

23       Q.    Do you know if President Taeho Cho reviewed these

24   two documents, Exhibits 8.3 and 8.4?

25       A.    (Through Translator) In the first page, it says to

1    look into again, but --

2        Q.   Just for the record, you're pointing at

3    Document 8.1; is that correct?

4        A.   **(Through Translator)** Yes, on 8.1, that is the

5    president's signature so looking at that then, I would say

6    that he has looked over this.

7        Q.   Okay.  Circling this signature at the top; do you

8    recognize that signature?

9        A.   **(Through Translator)** Yes, I know that is President

10   Cho's signature.  I do recognize it.  It is the same as the

11   one in the front.

12       Q.   How about the handwriting in the second column; do

13   you know who wrote that?

14       A.   **(Through Translator)** That doesn't look my

15   handwriting, but I don't know whose it is.

16       Q.   What does that say?

17           **TRANSLATOR:**  I'm having trouble looking for the

18   exact word for this.

19           **MR. THOMPSON:**  Do you have a word for that?

20           **MS. LEE:**  I think senior director.

21           **MR. THOMPSON:**  What do you think?

22           **MS. LEE:**  Senior director.

23           **MR. THOMPSON:**  Okay.  (Inaudible.)

24           **MR. THOMPSON:**  You don't agree?  What do you

25   think it is?

1          DR. LEE:  According to Korea business law, it is

2    executive.  Some companies use different names --

3    (Inaudible.) -- is not clear, I don't know.  (Inaudible.)

4          MR. THOMPSON:  Okay.  So now we've had input

5    from both parties.

6          DR. LEE:  (Inaudible.)

7          MS. LEE:  As long as he mention World

8    Construction they are stating -- (Inaudible.) -- currently

9    probably now they aren't doing it, but by that time, that's

10   their first time to assign somebody.  Foreign country, they

11   don't -- they never translate --

12         MR. THOMPSON:  So, you've had a lot of input,

13   and it's your call on what you think the word should be.

14         TRANSLATOR:  I think, first can I --

15   (Inaudible.)  I believe that may be President Cho's opinion,

16   he may have expressed his opinion that he thinks that that

17   position may be the right position.  That's my call.  I would

18   have to say senior director.

19         MR. THOMPSON:  Okay.

20         TRANSLATOR:  Do I have to interpret the

21   discussion?

22         MR. THOMPSON:  Do you remember what it was?

23         TRANSLATOR:  Yes.

24         MR. THOMPSON:  Okay.

25         THE WITNESS:  (Through Translator) Overall, the

1   discussion is right.  However, whether it is a --
2   (Inaudible.) -- or managing director -- or director or senior
3   director, if you look in the company, the president of a
4   small subsidiary company can become department head of the
5   company, and the department head is even hardly an executive,
6   so if you look at World Construction at that time, we did not
7   have many employees.  So someone in their 20's could become a
8   president or become a vice president, but for external
9   activities, if you have a low title, then it makes it
10  difficult to carry out business activities outside.  They're
11  core in consideration of the business activities that this
12  person will have to carry out outside, we try to put the
13  position as high as we can, and that is common etiquette, so
14  this is for the development of the company, so you cannot put
15  too much meaning into the name of a position.

16  BY MR. THOMPSON:  (CONTINUING)

17      Q.   Does your signature on the top of Page 8.3 signify
18  your consent to pay for the actual amount of Mr. Chung's
19  moving expenses from Korea to Saipan?

20          MR. GREGORY:  Objection; vague as to what
21  signature you're talking about.

22          MR. THOMPSON:  I'm talking about the only
23  signature we've been talking about, the top of Page 8.3.

24      A.   (Through Translator) That doesn't mean that.  You
25  said agreement, but this is a working-level reference

1    document and it looks like nobody actually looked over this

2    before it came up to me.  And I do not have the ability nor

3    do I feel the necessity to look over all of this, because

4    that is something that a working-level employee should do.

5    And the working-level employee would make the judgment

6    whether the contents were appropriate or not.  I do not have

7    the ability to make such judgments, and what the chairman

8    does is say, okay I would like this person to come to the

9    company, and that is the only core point of the signature.

10   BY MR. THOMPSON:  (CONTINUING)

11       Q.   Why did you want Mr. Chung to come to the company?

12       A.   **(Through Translator)** I had received reports from

13   working-level employees involved in this process and I had

14   received reports that Mr. Chung would be qualified to work in

15   the company, and also in the process I had heard Mr. Chung's

16   opinions as well, and I made the judgment that it would be

17   good to employ him.  So, as the chairman, the chairman looks

18   at the issues in which the chairman has to make the decision.

19   And regarding the other issues, the other issues are screened

20   in each department where they are taken care of.  As the

21   chairman, I would only look into the areas where I would make

22   decisions.

23       Q.   And what areas were those that you made the decision

24   in about Mr. Chung's employment? (Inaudible.)

25            **TRANSLATOR:**  What he said?  (Inaudible.)  I

1  asked Mr. Cho, you said that you only look with interest into

2  the areas where you make the decisions, and he answered that

3  I look into the policies.  I check into the areas whereas the

4  chairman I have the responsibility to carry out these orders.

5           **TRANSLATOR:**  Can you ask the question again.

6  **BY MR. THOMPSON:  (CONTINUING)** .

7    Q.   My question was, what decisions did you take

8  responsibility for or what decisions did you make about Mr.

9  Chung's employment?

10   A.   **(Through Translator)** At this point, until the

11 official order was issued, nothing had been decided on.  Up

12 to this point, as the chairman, I had only stated my opinions

13 and my opinions could be wrong, so the executive involved

14 would have to verify that and they would have to sign the

15 papers which would show that they are taking responsibility

16 for that.  So, at this point, nothing was decided.  This is

17 all part of a process.

18   Q.   At any time, did you --

19           **THE WITNESS:  (Through Translator)** Can we take a

20 break?

21           **MR. THOMPSON:**  Sure.

22              (Off the record at 3:15 p.m.)

23              (Back on the record at 3:25 p.m.)

24 **BY MR. THOMPSON:  (CONTINUING)**

25   Q.   At the top of document identified as Exhibit 8.4

1    circled in red on your copy, Mr. Cho, is what I believe you

2    testified was the signature of your son, President Taeho Cho.

3        A.    **(Through Translator)** Yes.

4        Q.    And your son is the president of World Corporation;

5    is that correct?

6        A.    **(Through Translator)** Yes.

7        Q.    And he was the president of World Corporation in

8    April 2003; is that correct?

9        A.    **(Through Translator)** I believe that he was -- I

10   believe that he was appointed the president at that time, I

11   would like to expect your understanding that I do not want to

12   give a mistake in testimony because of a faulty memory.

13       Q.    Right, and I'm not going to ask you to guess.  If

14   you know, you do; and if you don't, you can just say so.

15            In the column where President Cho's signature is,

16   does that phrase in Korean language, does it say "basic

17   conditions"?

18       A.    **(Through Translator)** Yes.

19       Q.    Does the president's signature in that column

20   signify his approval of the basic conditions contained in

21   that column?

22       A.    **(Through Translator)** Well, it is the chairman that

23   makes the final decision, so the president would not be able

24   to make the decision.  It is the chairman who makes that

25   final decision, not the president.

1    Q.   Did you, the chairman, ever finally decide the basic

2   conditions under which Mr. Chung would be employed?

3    A.   (Through Translator) I do not know the details.

4   What I do know is that this person came to our company and I

5   knew his position, and that's all that a chairman needs to

6   know.  Regarding the details, this is all unspecified, so it

7   is not something that the chairman should intervene in.  And

8   if there was someone that for a special reason was entitled

9   to receive some special treatment, then I would receive a

10  report about that and I would receive that report after this

11  person has gone through the necessary procedures within the

12  involved department.

13   Q.   Did you say that it was the chairman's

14  responsibility to decide the basic conditions for Mr. Chung's

15  employment?

16       MR. GREGORY:  Objection; mischaracterizes

17  testimony.

18       TRANSLATOR:  Ask the question again, sorry.

19  BY MR. THOMPSON: (CONTINUING)

20   Q.   Did you say just a moment ago that it was for the

21  chairman to decide the basic conditions of Mr. Chung's

22  employment and not the president?

23   A.   (Through Translator) Regarding the employment

24  conditions, based on this document, even the chairman can't

25  make a decision.  So, obviously, the president can't make a

Kyu Sang Cho:  September 5, 2005

1    decision.  The president's signature here just signifies that

2    I have seen this document, now report this document to the

3    chairman, and from the contents of this document, even the

4    chairman, even the chairman can't make the decision, so the

5    president can't make the decision.  This is just a reference.

6        Q.   Did you ever make a decision about the terms and

7    conditions of Mr. Chung's employment?

8        A.   **(Through Translator)** That would be the official

9    order.  As the chairman the official order would be the final

10   order, and the core areas that I am the chairman would have

11   interest in, is first of all, whether to employ this person

12   or not.  That is the most important decision that the

13   chairman makes.

14           And then the second would be the range of this

15   person's salary.  Is this person's salary fair in comparison

16   with other people in the company, and considering his level

17   of satisfaction, his level of ability, so the range of the

18   salary.

19           And then third, the additional issues would be

20   decided, not really decided but rather judged and taken care

21   of by working-level employees.  And the chairman does not

22   need to know anything other than that.

23       Q.   Did you ever learn what Mr. Chung's basic conditions

24   of employment were?

25           **MR. GREGORY:**  I'm going to object to this --

Kyu Sang Cho:  September 5, 2005

1  (Inaudible.)

2         MR. THOMPSON:  Let me ask it again.

3  BY MR. THOMPSON: (CONTINUING)

4     Q.   Did you ever learn the terms and conditions of Mr.

5  Chung's employment?

6     A.   **(Through Translator)** What do you mean by "employment

7  conditions"?  There are many types of conditions and the

8  chairman cannot know all of these conditions.  If you can

9  specify what kind of conditions you're talking about, then

10 maybe I can answer.

11    Q.   Was Mr. Chung's salary ever decided?

12    A.   **(Through Translator)** I don't know if you're asking

13 if it has been decided based on this document, but at the

14 time that the official order was issued, I assume that his

15 salary would have been decided because this is important

16 information.  When you decide to work for a certain company,

17 then the priority discussion that goes on between the

18 working-level employees is the salary.  It is based on the

19 salary discussion that the employee decides whether he's

20 going to take the job and whether we are going to employ this

21 person.  And with regards to the amount of the salary, I do

22 not know.  I do not even know the current salary level of our

23 current general manager.

24    Q.   Do you know whether the length of Mr. Chung's

25 employment contract was decided before the issuance of the

Kyu Sang Cho:  September 5, 2005

1  final order?

2      A.    (Through Translator) The term -- the period of the

3  employment contract cannot be determined at that point.

4      Q.    How do you know that?

5      A.    (Through Translator) This is because such issues are

6  decided when this official order is issued.  So everything is

7  decided at that point, even if you have agreed on everything,

8  even if you have negotiated everything, such agreements are

9  not valid until the day of this official order.  So, even if

10  you have negotiated anything, even if you have negotiated

11  everything, nothing that you have negotiated can be definite

12  until the day of the order.

13      Q.    Okay.  On the day of the order, was there a definite

14  term of employment granted to Mr. Chung as a condition of

15  employment?

16                  TRANSLATOR:  Definite term of employment?

17                  MR. THOMPSON:  Length of employment.

18      A.    (Through Translator) If you look at the document, it

19  does not say anything about the employment period.  As you

20  can see, it says a probation period of one-year and so I

21  would assume that after the probation period, that's when you

22  would start talking about the employment period.  And I think

23  that you need to understand the meaning of a probation

24  period.  Because within the probation period, if you look at

25  this pledge, this oath that the employee has to take, it

1   states that during this probation period the abilities and

2   capabilities of this employee will be judged and if the

3   company judges that this employee is not fit to be employed

4   to this company, then it says that I will respect the

5   decision of the company.  So after the probation period,

6   that's when you would decide the period of employment, and

7   actually that is something that the working-level employees

8   would decide, so I am not sure of the details, but I don't

9   think there has ever been a case where we have set an

10  employment period beforehand.

11  BY MR. THOMPSON: (CONTINUING)

12      Q.    Is that because most employees of World Construction

13  are hired for a lifetime of employment?

14          MR. GREGORY:  Objection; vague as to the term

15  "lifetime of employment."

16          TRANSLATOR:  Did you say "lifetime employment"?

17          MR. THOMPSON:  Yes.

18      A.    (Through Translator)  Well, you said lifetime

19  employment and, of course, lifetime employment would be

20  desirable and something that you would hope for, but actually

21  there is no such thing as lifetime employment.  In order to

22  be employed you have to have the -- you have to fit, the two

23  sides have to fit together.  It is just like a couple.  You

24  promise to spend the rest of your lives together but you can

25  get divorced after one year.

1    BY MR. THOMPSON: (CONTINUING)

2       Q.   Do you have personal knowledge about whether

3    Mr. Chung was made aware of the probationary period before

4    the execution of the final order which we have been looking

5    at as Document 8.6?

6       A.   **(Through Translator)** Well, there is no exception.

7    In HR the most important thing is fairness, and there is no

8    reason that we would give somebody a probation, while we

9    would give someone else -- where we wouldn't give someone a

10   probation period.  So, it's natural eating breakfast when you

11   wake up, so there is no reason for me to know that.

12      Q.   So the answer is no, you don't have any personal

13   knowledge that Mr. Chung was made aware of the probationary

14   period before the execution of the final order that is shown

15   on Exhibit 8.6?

16      A.   **(Through Translator)** The probation period is a very

17   obvious thing that we always have, so I didn't take any

18   interest and I didn't need to though because it was very

19   obvious.  I mean if it was something important, then maybe

20   somebody would have told me.

21      Q.   Was Dr. Lee, when he was hired, was he hired on a

22   probationary period?

23      A.   **(Through Translator)** I'm sorry, but that is

24   advisor's sister, this is the advisor's sister.  It is

25   somewhat of a personal issue, but an advisor to the chairman

1    is different from a regular worker and we do use non-regular

2    workers as well, and non-regular workers would not need to go

3    through a probation period.  So, it is when you are being

4    employed as a regular worker that you go through the

5    probation period, and this is because we need to know each

6    other better.

7          Q.    Was B.K. Park hired on a probationary period?

8          A.    **(Through Translator)** To my knowledge, I'm not sure,

9    but I think it is a little bit different in that case because

10   B.K. Park is not Korean by nationality, he is a foreigner and

11   I am not sure if we have a probation period when we employ

12   foreigners.  I have not seen the official order, so I do not

13   know.  I am not sure what is the practice that we follow for

14   foreigners.  For instance, when we employ local residents,

15   then I believe that we do not have a probation system for the

16   local residents.  But I'm going to have to check that.

17         Q.    Was Ms. Lee hired on a probationary period; do you

18   know?

19                **MR. GREGORY:**  Objection -- (Inaudible.)

20         A.    **(Through Translator)** I believe that the employees

21   that we hire locally are non-regular workers and in the case

22   of non-regular workers we do not have a probation period.

23   For instance, for temporary workers we would not have a

24   probation period, and so the people that we hire from Saipan

25   there is no probation period because they are non-regular

1    workers.  But when we're selecting regular employees, that's

2    when we need the probation period.  This is because nowadays

3    it is very difficult to fire an employee, and, therefore, we

4    have the probation period for the benefit of each party.  So,

5    it isn't a case of hiring a regular employee, excuse me, then

6    we wouldn't need a probation system.

7              MR. THOMPSON:  Before I ask the next question,

8    I'd like to caution you Dr. Lee, it's inappropriate for you

9    to signal to the witness yes or no along with his answers.  I

10   know that you're --

11             DR. LEE:  (Inaudible.)  I'm sorry.

12             MR. THOMPSON:  So, that's all I want to say.  In

13   the last answer you were shaking your head yes, and that's

14   not an appropriate response in a deposition.

15             MR. GREGORY:  I'd like to state for the record

16   that he wasn't signaling in any way.

17             MR. THOMPSON:  I don't think you were watching.

18             THE WITNESS:  (Through Translator) And I would

19   like to add that in the case of Mr. Chung, he had to go

20   through the probation period because he was in the process of

21   being employed as a regular employee, and if it was a

22   temporary position where he would stay for a certain period

23   of time, then he wouldn't need the probation period, but

24   because he was going through the process of being hired as a

25   regular employee, that's why he had to go through the

Civil Action No. 04-00001                                      153

1    probation period, and that is also why he was transferred,

2    why he received the order for the transfer, this was all

3    because he was in the process of being selected as a regular

4    employee.

5    BY MR. THOMPSON: (CONTINUING)

6        Q.   Was Jon Minbet (phonetic) hired on a probation

7    period?

8        A.   (Through Translator) Again, that is working-level

9    information, so I would have to see the official order in

10   order to be sure, but I believe that in his case he was also

11   hired as a local, non-regular worker.

12            MS. LEE:  Objection.  Contracted worker.

13            TRANSLATOR:  Excuse me, I'd like to change my

14   regular worker to contract worker.

15       A.   (Through Translator) Because he was also hired as a

16   contract worker, he did not have to go through a probation

17   period.  I believe that he was hired as a contract -- (Start

18   Tape 11, Side B.)

19            So Mr. Chung, he was not hired as a hotel expert,

20   but we had decided that he was capable of carrying out

21   development operations at World Construction and he thought

22   so as well, which is why he received the transfer and which

23   is why he went through the probation period.  The probation

24   period is not something negative, it is something that is

25   good for you because it is good to be given a regular

 1   employment after going through the probation period.  Because

 2   of the case of contract workers, the contract workers have a

 3   lower position in the office.

 4   BY MR. THOMPSON: (CONTINUING)

 5       Q.   I'm referring you, please, to Exhibit 8.3, and ask

 6   you to please read what is said after No. 1 at the top of the

 7   page.

 8       A.   (Through Translator) It says hiring hotel expert

 9   managers.

10       Q.   And that relates to the hiring of Mr. Chung; is that

11   correct?

12       A.   (Through Translator) Yes.

13       Q.   And his official post is with World Corporation; is

14   that correct as per this document?

15       A.   (Through Translator) Yes.

16       Q.   And in his academic history is included Cornell

17   University, 1992 to 1994, master's degree in hotel

18   administration; isn't that correct?

19       A.   (Through Translator) Yes.

20       Q.   And major career experience includes employment by

21   Walker Hill, and Konwan Land (phonetic), both of which are

22   hotel operations; isn't that correct?

23       A.   (Through Translator) Yes.

24       Q.   I'd like for you to look at the document which is

25   identified as 8.12.  Have you seen this document before?

1    A.    (Through Translator) Yes, I have seen it, obviously

2  because I have signed it.

3    Q.    May I ask you to circle your signature, please.

4    A.    (Witness complied.)

5    Q.    Thank you.  Does your signature on this page signify

6  your acceptance agreement with the contents of this document?

7    A.    (Through Translator) That is not signaling

8  agreement, this is a decision, it is an order, so you have to

9  follow -- that these orders have to be followed.

10    Q.    And what is this order?

11    A.    (Through Translator) From -- it says release from

12  World Corporation and transferred to World Construction

13  Headquarters, Sales Department as a director, the title of a

14  director, and in the position of an executive in charge of

15  overseas operations.

16    Q.    And were you the final decision-maker with respect

17  to that order?

18    A.    (Through Translator) Yes.

19    Q.    And what information did you rely on in making your

20  final decision?

21    A.    (Through Translator) I relied on my -- (Inaudible.)

22  -- information, information from members of World

23  Construction, directors from hotels, the opinions of local

24  residents, and also reports that I, as the chairman, had

25  received throughout that time, and overall I made the

Kyu Sang Cho:  September 5, 2005

1   transfer order based on my management philosophy.

2       Q.   You say you relied on information from members, who

3   were those members?

4            **MR. GREGORY:**  Objection; mischaracterizes prior

5   testimony.

6       A.   **(Through Translator)** The person that has the most

7   information regarding overseas operations and is a fluent

8   speaker of English and also has experience in hotel

9   acquisition would be Dr. Lee, Dong Sung, and aside from him

10  there are also many others.

11  BY MR. THOMPSON: (CONTINUING)

12      Q.   Who are the others?

13      A.   **(Through Translator)** According to the level of

14  importance regarding their roles, as I have said, Dr. Lee and

15  then Hoogaf Won (phonetic) and then vice president Park from

16  the support headquarters, also B.K. Park, the other general

17  manager of the hotel, as well as two Korean working-level

18  employees and one Japanese division head, and I believe that

19  there may have been more, but those are the ones that I can

20  remember.

21      Q.   Okay.  And what information did Dr. Lee give you

22  that informed your final decision as reflected in this order?

23            **MR. GREGORY:**  Objection; mischaracterizes prior

24  testimony.

25      A.   **(Through Translator)** As I said yesterday, the most

1   important aspect of running a hotel is service, friendliness

2   and a bond with the local residents.  And he had involved

3   himself in disturbing Mr. Kekowa from coming to Korea.  He

4   had an important role in Mr. Kekowa's decision.  And as I

5   said yesterday, I was thinking how could he do this in his

6   position and I was very surprised, and there may have been

7   other reasons, but this was the main reason.

8   BY MR. THOMPSON: (CONTINUING)

9       Q.   Is it possible that you were mistaken about Kekowa's

10  reason for not coming to work for World Resort?

11              MR. GREGORY:  Objection; calls for speculation.

12      A.   (Through Translator) I received a report that it was

13  a fact that Mr. Chung had in fact talked to Mr. Kekowa and

14  whether this is the reason why he decided not to come back,

15  on that I will have to look into, but the fact itself I

16  believe is true.

17              MS. LEE:  Objection.  Instead of talk, backbite,

18  or stab.

19              TRANSLATOR:  Back stab.

20              MR. THOMPSON:  Do you agree with that?

21              TRANSLATOR:  I agree with that.

22              (Inaudible colloquy.)

23              MR. THOMPSON:  No, you can just say objection.

24  That's the word.

25              (Inaudible colloquy.)

Kyu Sang Cho:  September 5, 2005

1          Did you translate -- (Inaudible.)

2          **TRANSLATOR:**  I would like to make a correction.

3   May I report both of these?

4          **MR. THOMPSON:**  Sure, sure.

5     A.   **(Through Translator)** Regarding the fact that

6   Mr. Chung back stabbed Mr. Kekowa I received a report that

7   that itself was a fact.  And whether this is the reason that

8   Mr. Kekowa decided not to come back, that will need further

9   investigation, but from what I have heard, I assume that the

10  fact that Mr. Chung had back stabbed Mr. Kekowa is true.

11         I would like to add that due to this incident I had

12  made a call to Mr. Chung and told him in very -- rather

13  harshly that he should rebuild the bond with the local

14  residents and he responded that the chairman was making him

15  take the bad role, take on the adversary role and so I did

16  point that out quite harshly for him to do that.

17  BY MR. THOMPSON: (CONTINUING)

18    Q.   Did you meet with Mr. Chung after you had that

19  telephone call and during that meeting discuss Mr. Kekowa?

20    A.   **(Through Translator)** I do not remember if I had a

21  discussion about Mr. Kekowa with Mr. Chung, I just remember

22  that I reprimanded him.

23    Q.   Do you remember meeting with Mr. Chung in Seoul on

24  about May 11th and discussing Mr. Kekowa?

25    A.   **(Through Translator)** I don't remember that date.

1    Q.   Do you remember a meeting with Mr. Chung discussing
2  Mr. Kekowa?

3    A.   **(Through Translator)** I don't know how you would
4  classify it -- I don't know what you mean by "discussion."
5  When you say the word discussion it means -- you can use the
6  word discussion when you're talking on equal terms, but there
7  was -- there could have been some information exchanged
8  regarding some positive or negative aspects of Mr. Kekowa and
9  when you use the -- if you want to use the word discuss then
10 I believe that this means a debate when you're on equal
11 terms.  But I believe that I did receive information that for
12 so and so reasons that Mr. Kekowa was not very positive.

13   Q.   You never asked Mr. Kekowa why he wasn't going to
14 accept the job as general manager at World Resort, did you?

15           **MR. GREGORY:**  Objection; asked and answered
16 yesterday.

17           **MS. LEE:**  Objection.  (Speaking in Korean.)

18           **MR. THOMPSON:**  Say in English first.

19           **MS. LEE:**  Her English translation, I mean her
20 Korean translation is, you never ask why don't you take this
21 position, general manager's position, like that, but your
22 question is never ask why he was not going to -- why he was
23 not take that position.  Why don't you.  You never ask why
24 don't you take this position, but your question is you never
25 ask the reason that he was not take the position.

1           MR. THOMPSON:  Okay.

2           (Inaudible colloquy.)

3      A.    (Through Translator) As I said yesterday, I invited

4  him to Korea and I am not exactly sure of location where we

5  met, but first of all, I wasn't talking to him directly.  I

6  couldn't communicate with him directly, I had to speak

7  through an interpreter.  And I didn't ask him specifically

8  why the reason that he wasn't coming back because I had heard

9  of the reason indirectly, so if I had said to talk to him

10 about the specific incident of Mr. Chung saying that I will

11 be the general manager and you can be the vice manager, then

12 he might understand that that is the chairman's intention as

13 well, and if you tell someone who is currently the general

14 manager to become a vice manager, that's actually a bigger

15 insult than telling him to leave.  So, and at the same time I

16 can't take back what Mr. Chung said, so I met him in order to

17 encourage him and I spoke to him in a tone that what Mr.

18 Chung was his own thoughts and that my thoughts are different

19 and I didn't ask him the reason why he wasn't coming back

20 because that would have been hurting him twice.

21          MR. GREGORY:  As we discussed off the record a

22 few times, World would like the opportunity to question the

23 witness the last half-hour of the deposition.  We believe

24 that we are entitled to that opportunity and we hereby

25 request, and I understand that you were disagreeing with that

1  position.

2          MR. THOMPSON:  Right.  I disagree because that

3  wasn't anything we discussed before today.  I agree under the

4  rules you have a right to cross-examine, I would also have

5  the recross.  But one thing that was agreed was that we would

6  set time limits for the protection of the witness and to

7  allow us, the plaintiffs, enough time to depose the witness.

8  There's a lot of questioning that I would like to do that I

9  know that I will not be able to do because of the time

10  limits, and in setting those time limits and agreeing to the

11  stipulation there was no discussion of some time being

12  reserved for cross-examination.  Furthermore, you have access

13  to Chairman Cho because he is your client and you can speak

14  with him at length at any time and it's not necessary for you

15  to depose him.  And, if you want to depose him, you could

16  always set a deposition.  I will not object, we will not

17  object to a deposition as long as it doesn't delay the trial.

18          MR. GREGORY:  Again, the stipulation does not

19  say either way that there will not be permitted cross and

20  rebuttal and that is customary in all depositions and we

21  believe that it's certainly compliant with that.  Chairman

22  Cho is a very busy man, so opportunities to speak with him

23  are not easy to come by.  And we assert on the record that we

24  have missed opportunity to do so.  Again, if that right is

25  denied today, we reserve any and all rights that we may have

1    regarding the possibility of opportunity to ask questions of

2    the chairman as well as -- (Inaudible.) -- that last

3    half-hour of your questioning.

4               MR. THOMPSON:  Okay.  And I'll also put on the

5    record that I'm available tomorrow.  I'm willing to come in

6    here to complete my questioning and allow you as much time as

7    you want to cross-examine provided that I have time for

8    recross which is also provided in the rules.

9               MR. GREGORY:  And for the record, my flight

10   arrangements are made for this evening and, again, the

11   stipulation calls for two days.

12              MR. THOMPSON:  So I would like to continue the

13   questioning.

14              MR. GREGORY:  (Inaudible.) -- our objection.

15              TRANSLATOR:  Do you want me to translate?

16              MR. THOMPSON:  I don't think so.

17   BY MR. THOMPSON:  (CONTINUING)

18       Q.   Mr. Cho, looking back at Exhibits 8.3 and 8.4.  You

19   have those in front of you there?  Do you see any indications

20   that you made to that document, any indications of your

21   disagreement with any term listed on these two pages?

22              MR. GREGORY:  Objection; asked and answered.

23              MS. LEE:  Objection; disagreement.

24       A.   (Through Translator) We are talking about agreeing

25   again, but as I have said this is an initial report that is

1    used as a reference for the chairman to make a decision.  So,

2    based on this report, the executives would go over the

3    details of this report in order to receive a decision from

4    the chairman, so it is an internal document for that purpose.

5    **BY MR. THOMPSON:  (CONTINUING)**

6        Q.    Do you recall if at the time you read this document

7    there was anything in here other than the salary change, any

8    other term that you wanted to change?

9            **MR. GREGORY:**  Objection; (Inaudible.)

10    A.    **(Through Translator)**  Regarding the mark that I made

11   regarding the salary, I always emphasize the importance of an

12   incentive to be used as motivation, and what I marked here

13   was that rather than giving him a flat 90,000 that we should

14   perhaps give him 80,000 plus incentives.  And the other

15   areas, these are areas that other people need to look at.

16   There is nothing that I know regarding any of the other

17   areas, and so the departments that are in charge of each area

18   would have to look into each of the specific issues and then

19   return that to me for approval, and so I would like to

20   emphasize again that to all extent, any extent, this is a

21   reference document, it has no meaning, is has nothing that is

22   decided on this and this is simply a part of the process in

23   order to receive the exclusive decision of the chairman.  So

24   the signatures on this document have no meaning, even in an

25   organization, the chairman cannot make arbitrary decisions.

*Civil Action No. 04-00001*                                                  164

1  | BY MR. THOMPSON: (CONTINUING)

2  |     Q.    Thank you.  Back to Exhibit 8.12.  And before we

3  | took a break you were discussing the reasons why you made the

4  | final decision which is shown in this order.

5  |          MR. GREGORY:  I'm going to object to this line

6  | of questioning.

7  |          MR. THOMPSON:  That was a warmup.

8  | BY MR. THOMPSON: (CONTINUING)

9  |     Q.    The question is, expressed in terms of percentages,

10 | I would like for you to estimate the percentage of the -- in

11 | terms of your overall final decision to release Mr. Chung

12 | from World Corporation, how important was the issue about

13 | Kekowa that we have discussed yesterday and today?

14 |          MR. GREGORY:  Objection; vague.

15 |     A.    (Through Translator) Rather than speaking in terms

16 | of percentages as I said, the most important aspect of a

17 | hotel is service, friendliness, and everybody has different

18 | policies and I thought that for the time being that Mr. Chung

19 | would be better as a team manager for World Construction,

20 | because if he worked as a team manager for World

21 | Construction, then the hotel operation would also fall into

22 | that range, so I was considering his aptitude and I felt that

23 | he would not be able to achieve harmony as a vice manager of

24 | the hotel or as a vice manager, and also he had agreed that

25 | he would go to World Construction, the advisors have already

Kyu Sang Cho:  September 5, 2005

1    agreed that that was a good idea and we had already received
2    the documentation that said that Mr. Chung agreed to this
3    transfer.  If he had said no at that time, perhaps I wouldn't
4    have transferred him.  And even if I hadn't transferred him I
5    probably wouldn't have fired him, because anybody can make
6    mistakes, so which is why I received his agreement, which is
7    why I happily issued this order.  And if I had known that it
8    would cause so much trouble to everybody in this room, then
9    perhaps I would have canceled that order.  If this order
10   currently is not able to proceed, it is in its current state,
11   I cannot fire him right now, also it is stifled in its
12   current state.  And if he was a contract worker then it would
13   be easier, but because he was going through a probation
14   period which means that he was in the process of becoming a
15   regular worker, this meant that it was possible to transfer
16   him from World Construction to World Corporation, and so on.
17   And I had also received his okay which is why I happily
18   issued this order, and yes I had heard about the incident
19   with Mr. Kekowa but anybody can act out of self-greed, and so
20   I made this transfer in order to develop Mr. Chung, so it was
21   actually an action of goodwill that I made this transfer.
22              MS. LEE:  Objection.  Instead of "department
23   manger of the construction," he was "overseas development
24   team leader," "overseas development and department team
25   leader."

1              MR. THOMPSON:  Do you agree with that?

2              TRANSLATOR:  No, I don't agree with that.

3    (Inaudible.)

4    BY MR. THOMPSON: (CONTINUING)

5      Q.    How did Mr. Chung inform you that he agreed to the

6    transfer order that is Document 8.12?

7      A.    (Through Translator) Well, I remember receiving a

8    facsimile to my home saying that I will follow your order,

9    and I had also confirmed with him personally.  Also, my

10   advisors had told me that he had agreed to that, and then

11   suddenly I heard that he would not be coming, so I was very

12   flabbergasted because I had acted out of goodwill and in my

13   30 years experience in the business, things like this don't

14   happen, this was the first time.  And if you are talking

15   about Korean law, then what he was doing was refusing to

16   comply to official order, and in Korea that would be

17   considered a very big crime.

18              And I would like to add that if I, as a chairman,

19   made a mistake in issuing this official order, that perhaps

20   you can point out what I did wrong.

21              MS. LEE:  (Inaudible.)  You translate chairman

22   for --

23              TRANSLATOR:  In my last translation I said that

24   the chairman had received a facsimile to his home saying that

25   Mr. Chung would follow his orders.  I would like to make a

1   correction.  He said that he received a facsimile to his home

2   with a message by Mr. Chung saying that he would follow his

3   will.

4                MR. THOMPSON:  Is that what he said?

5   BY MR. THOMPSON: (CONTINUING)

6       Q.   Other than the issue about Mr. Kekowa, was there any

7   other reason that you decided to issue this order?

8       A.   (Through Translator) There were many other reasons

9   for my decision.  I cannot point them all out at this time,

10  but for first of all, Mr. Chung failed to get along with or

11  to fuse with the employees and the executives at the office,

12  and also I had asked Mr. Park, who was a general manager at

13  that time, his opinion regarding Mr. Chung and he couldn't

14  say directly anything negative about Mr. Chung, but he said

15  that is it worth spending that much expenses on this person

16  and he was very proactive in expressing his disapproval.

17              And I also asked the local residents and they said

18  that regarding his attitude, regarding his personality, they

19  had some negative things to say.  It is important to form

20  harmony with the local residents because a hotel is a service

21  business and it's supposed to be friendly to the local

22  residents and he has a very impressive academic background,

23  but his attitude didn't seem to fit with that position, so I

24  thought that it would be better to keep him in Korea by my

25  side and in that case, attitude would be a better fit for

1  this other position and there are also reasons, many other

2  reasons for my decision, but I cannot list all of them in a

3  short period of time.

4          But, as I said, he has very impressive academic

5  background and I wanted to develop his talents so it was --

6  because he has such good schooling and so I thought to myself

7  a dozen times that I should develop, I should foster, I

8  should nurture this person, and based on the probation

9  period, I came to the conclusion that he would be better fit

10 for this position, and I did the best that I could.

11     Q.    Did you have any direct communications with local

12 residents from Saipan about Mr. Chung?

13     A.    (Through Translator) I talked to the Korean

14 residents, Koreans residing in Saipan, and through an

15 interpreter I also talked to a few local residents of Saipan.

16     Q.    Who were the Korean residents that you spoke with?

17     A.    (Through Translator) If I go to a local restaurant

18 and there are Korean people there, I would talk to them while

19 we were eating, maybe have a drink together, and I would

20 indirectly touch up on the subject and I actually received

21 not very positive responses regarding Mr. Chung.  And also

22 Mr. Won, and I do not remember his name, but someone else

23 that is stationed in Saipan, when they come to Korea I would

24 ask their opinion as well, and other than that I would speak

25 to people through an interpreter and I would just like to say

1    that I hope you trust me, that you believe me on this issue

2    because why would I try to do something bad to a good person,

3    I am representing a company, so I hope that you will trust

4    me.

5         Q.   Was one of the local people who gave you information

6    about Mr. Chung, Mariko Lizama?

7              MS. LEE:   Mariko Lizama.

8         A.   (Through Translator) I believe Mariko is Japanese

9    and I do not speak Japanese, so I did not talk to him

10   directly, I spoke to him through an interpreter, and he did

11   give me some information.  I believe that he had some

12   relationship with Mr. Kekowa.

13   BY MR. THOMPSON: (CONTINUING)

14        Q.   What did he tell you?

15        A.   (Through Translator) Okay, I did not directly talk

16   to Mariko because I do not speak Japanese, but I believe that

17   the information that I've told you about that I heard through

18   an executive was -- that the source of the information was

19   Mariko.  This is a speculation, but I believe that Mariko had

20   heard many things from Mr. Kekowa and to put it in extreme

21   terms, she said that Mr. Kekowa had said that there is just

22   too much back stabbing which is why he would not be returning

23   and I believe I heard that Mariko went as far as to name

24   Mr. Chung, but I did not hear this directly, so I cannot say

25   for sure.

1          MR. GREGORY:  It's a little past five o'clock.

2          MR. THOMPSON:  In keeping with our stipulation,

3   I will conclude the deposition now.  I'd like to thank you

4   Chairman Cho for being here.  We appreciate you giving your

5   time.  Thank you Dr. Lee, Mr. Gregory, Ms. Lee, translator as

6   well.  Thank you.

7

8                    (Deposition concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kyu Sang Cho:  September 5, 2005

## CERTIFICATE OF WITNESS


I, Kyu Sang Cho, being first duly sworn on oath, depose and say that I am the witness named in the foregoing deposition transcript and that I have read the questions and answers thereon as contained in the foregoing deposition, consisting of pages 1 through 170; that the answers are true and correct as given by me at the time of taking the deposition, except as indicated on the correction sheet.


_____
Kyu Sang Cho

REPORTER'S CERTIFICATE


      I, Veronica A. Flores, Certified Shorthand Reporter, hereby certify that I transcribed the following proceedings, pages 1 to 170, to the best of my ability.

      Witness my hand at Barrigada, Guam, this 26th day of September 2005.


_____
Veronica A. Flores, CSR-RPR